1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
3    - - - - - - - - - - - - - - - - - - X

     UNITED STATES OF AMERICA,          :    CR-05-273
4
5              v.                        :    U.S. Courthouse
                                              Brooklyn, New York
     MOHAMMED RAHMAN,                    :
6
                                              January 5, 2006
7              Defendant.      :    11:00 o'clock a.m.

8    - - - - - - - - - - - - - - - - - - X

9                    TRANSCRIPT OF SENTENCE
                BEFORE THE HONORABLE JOHN GLEESON
10              UNITED STATES DISTRICT JUDGE

11
     APPEARANCES:
12
     For the Government:              ROSLYNN R. MAUSKOPF
13                                    United States Attorney
                                      By:   JACK SMITH
14                                          ROGER BURLINGAME
                                      Assistant U.S. Attorneys
15                                    225 Cadman Plaza East
                                      Brooklyn, New York 11201
16
     For the Defendant:              RONALD NIR, ESQ.
17

18
     Court Reporter:                 Anthony M. Mancuso
19                                   225 Cadman Plaza East
                                     Brooklyn, New York 11201
20                                   (718) 260-2419

21

22

23
     Proceedings recorded by mechanical stenography, transcript
24   produced by CAT.

25

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

2

1        (Case called; both sides ready.)

2        MR. SMITH:  Jack Smith and Roger Burlingame for the

3 United States.

4        MR. NIR:  Ronald Nir for the defendant Mohammed

5 Rahman.  Good morning, your Honor.

6        THE COURT:  Good morning.

7        Okay.  Mr. Nir, are you and your client ready to

8 proceed to sentence?

9        MR. NIR:  Yes, your Honor.

10        THE COURT:  Have you read the presentence report?

11        MR. NIR:  Yes, I have.

12        THE COURT:  Have you, sir?

13        THE DEFENDANT:  Yes, I have.

14        THE COURT:  Any objections to the presentence

15 report?

16        MR. NIR:  Any objection we had I gave in my letter

17 to the court.

18        THE COURT:  Okay.

19        Sometimes they fall by the wayside.  I take it yours

20 have not.

21        MR. NIR:  No, your Honor.

22        THE COURT:  Okay.

23        Remind me what they are.

24        MR. NIR:  Judge, just in general there were some

25 difficulties in the English language with regard to my

3

1   client's brother who was questioned with respect to certain

2   actions.  I had indicated to the probation officer that the

3   better part of valor would be to speak with that individual in

4   Arabic, not in English.

5              In addition, there were some problems that my client

6   actually had with regard to the marriage relationship between

7   him and Ms. Vernazza when he gave the wrong year in terms of

8   the date and Ms. Vernazza corrected that.

9              There were some minor points.

10             THE COURT:  If you want me to address specific

11  changes to the presentence report, tell me what they are.

12  None of those issues with regard to the interview of the

13  brother or with regard to the marriage have any effect on the

14  sentence as far as I'm concerned.

15             MR. NIR:  That's fine, your Honor.

16             THE COURT:  Anything else with regard to the

17  advisory guideline calculation or the presentence report

18  before I hear from you about the appropriate sentence?

19             MR. NIR:  No, your Honor.

20             THE COURT:  Just so we're all on the same page, the

21  advisory guideline range is 33 to 41 months, correct?

22             MR. NIR:  That is according to the presentence

23  report.

24             MR. SMITH:  We made a motion for a two-point

25  enhancement for preparation and planning.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

4

1            THE COURT:   Where is that motion?

2            MR. SMITH:   That is in the letter dated November 1,

3    2005.  I have another copy here, your Honor.

4            THE COURT:   Someone remind me why this was adjourned

5    the last time.

6            MR. SMITH:   We adjourned it and there was

7    miscommunication about what date it was on.

8            THE COURT:   That's right.  Through no fault of your

9    own, you were not here.

10           MR. NIR:   I actually came in on the next date and

11   found out that it was adjourned again.

12           THE COURT:   Now, I got it.

13           What is the date of your letter?

14           MR. SMITH:   The letter that makes the upward

15   adjustment motion is November 1 of 2005.  We also submitted a

16   letter in response to Mr. Nir's's letter, which is dated

17   December 8 of 2005.

18           THE COURT:   That I have three copies of,

19   compensating for that fact is that I don't have any copies of

20   your other letter.

21           You've seen it, I take it?

22           MR. NIR:   Yes.

23           (Pause.)

24           THE COURT:   Okay.

25           Mr. Nir, what's your response to the government's

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

5

1   application for an upward adjustment under the subsection

2   (b)(1) of 2J1.2.

3           MR. NIR:   Judge, if I may, it appears that the

4   information that my client gave both to this court and to the

5   U.S. Attorney's Office was in full confidence and full effect

6   under the proffer agreement and at the time he took the plea.

7           My client actually gave all of the same information

8   that the government is seeking an upward adjustment for prior

9   to his taking a plea, and then with this court in taking the

10  plea.

11          In point of the fact, your Honor, the probation

12  report itself gave my client an extra point or points.  Those

13  two points, I would argue, are already in the presentence

14  report because according to the plea agreement that we had

15  entered into my client would have been at a level 16 at the

16  time of sentence in this matter.  In effect, the Probation

17  Department, by raising it to a level 18, actually gave the two

18  points that the government is seeking.

19          The upward adjustment that they are seeking is for

20  things that my client already has admitted to.  It's not for

21  anything more or less than that.

22          The countenance  --.

23          THE COURT:   That's not a reason not to give it to

24  him.  Maybe he gets points for candor.  But what you say

25  doesn't suggest a reason not to give him the adjustment.

6

1         MR. NIR:  No, your Honor.

2         In effect, your Honor, the government by now asking

3    for this, after having the plea agreement in force and effect

4    for several months, is asking the court to not abide by the

5    plea agreement that was entered into in this case.

6         THE COURT:  I see.

7         MR. NIR:  And to  --.

8         THE COURT:  Can I have the plea agreement?

9         MR. SMITH:  If I may, judge, actually there was a

10   mistake by me in the plea agreement, but it's not this one.

11   We assessed planning and preparation in the plea agreement.

12   However, what I didn't do is we did not add an assessment in

13   there for his leadership role in this offense and that results

14   in the numbers that Mr. Nir is talking about.

15        THE COURT:  I see.

16        MR. SMITH:  Because I didn't put the four points in

17   for that, the Probation Department correctly did and  -- but

18   they didn't put in these two points.  The net effect is that

19   the probation guideline analysis is two points higher than the

20   plea agreement estimate.

21        THE COURT:  I got you, I think.  Hang on a second,

22   Mr. Nir, before you finish your argument.

23        (Pause.)

24        THE COURT:  I see.  So the probation officer jacked

25   it up four but didn't give you the two that you sought for

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

7

1  planning and preparation?

2           MR. SMITH:  Exactly, judge.

3           THE COURT:  Now, I get it.

4           MR. NIR:  Both the planning and preparation and

5  leadership roles were both known to the government prior to

6  the plea agreement in this case and in point of fact there

7  were several proffer agreements in which my client described

8  those matters as well as other matters in an effort to

9  cooperate with the government in this matter.

10          And in other matters as well.

11          The fact of the matter is, your Honor, whether or

12  not he is the leader in this matter, a plea agreement was

13  entered into.  More importantly, those leadership aspects, in

14  what the people performing this conspiracy, really in some

15  ways amounts to friends talking amongst friends as well.

16  Fawaz Habbas worked for my client in this matter and some of

17  the planning and preparation were his and that's based on the

18  tapes that were turned over to the government with respect to

19  this matter.

20          In point of fact, the ultimate incident against

21  Gemal Wahed in this matter was not in relation to my client.

22  In fact, the original plan was supposed to have happened the

23  day before this incident.  The government has agreed to that

24  argument in prior discussions and the subsequent plan, the

25  plan that actually entered was a plan that Fawaz Habbas

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

8

1  actually generated on the date of that incident.  My client

2  wasn't in New York.  That may very well have been because the

3  intention was that he was not to be part of the actual

4  incident.

5          But those leadership roles and those increased

6  points that the government is asking for were all

7  contemplative of the plea agreement in this matter and they

8  were all known to the parties in full force and effect.

9          THE COURT:  All right.

10         Well, let me say, right at the outset, how this gets

11  resolved has no bearing on the sentence that I will impose and

12  would not have done so even in a mandatory guideline range

13  era.

14         But the dispute in a way just puts a spotlight on

15  the horse trading that kind of goes on with guideline

16  adjustments.

17         The four level upward role adjustment wasn't in the

18  plea agreement, but there was no objection to it from the

19  defendant.

20         The two level upward role adjustment for planning

21  and preparation is in the plea agreement and it's only the

22  government's effort to get it into the guideline calculation

23  that has brought the objection on from the defendant.

24  Implicit in your remarks  -- and I'll make it explicit for you

25  -- you're fine with these four levels as long as you don't get

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

9

1    the other two levels for planning and preparation, right?

2              MR. NIR:  Well, judge, that's actually not fully

3    correct.

4              THE COURT:  You never made an objection to the four

5    levels.

6              MR. NIR:  I understand that, in that my argument

7    has always subsumed everything that the government is asking

8    also subsumes the arguments in the increased levels that the

9    Probation Department has garnered.  You can argue whether or

10   not it should be increased by two levels or increased by four

11   levels or increased by six levels.

12             The fact of the matter is that all of that

13   information was known.  My client cooperated, with myself

14   present, during the Probation Department interview.  I cannot

15   take fault or error with respect to those things that my

16   client said in my presence at the time of the meeting with the

17   Probation Department.  But my argument, your Honor, is that

18   those four levels subsume the two levels, that they are all

19   inclusive.

20             THE COURT:  I understand your argument.

21             MR. NIR:  Thank you, your Honor.

22             THE COURT:  I don't begrudge you making it.  It's

23   less precise than these guidelines purport to be.  These

24   guidelines require us to look at the facts that bear on role

25   and then look at the facts that bear on planning and

ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

10

1   preparation, decide whether those separate adjustments are

2   appropriate.   There's the separate issue that you have alluded

3   to about holding the government to what it predicted in its

4   plea agreement, but you don't really mean that argument.   If

5   you did you would have made an objection to the four level

6   upward adjustment.

7           Let me clear away this underbrush, because I say

8   again it's academic as far as I'm concerned, maybe it won't be

9   to some reviewing court.   As far as I'm concerned this

10  resolution is academic to the appropriate sentence in this

11  case.

12          I'm going to resolve it in favor of the government

13  because the facts are in the government's favor.   Obviously, a

14  role adjustment is appropriate.   He led this conspiracy to

15  frame the victim of this crime, Abdul Wahed.   The requisite

16  number of participants were involved in the crime.   It's also

17  obvious to my mind  -- and I so find  -- that it involved the

18  sort of planning and preparation contemplated by subsection 3

19  of 2J1.2 (b), that is, if the offense was extensive in scope,

20  planning or preparation.   It was for the reasons set forth by

21  the government in its letter.

22          So, the government's objection to the presentence

23  report is sustained.   The guideline range is adjusted upward

24  two levels accordingly, which brings us to a total range

25  rather of 41 to 51, is that correct?

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

11

1          MR. SMITH:  That's correct, judge.

2          THE COURT:  I'll say it for a third time that the

3    resolution of that sentencing dispute is not necessary within

4    the meaning of the Birmingham line of cases from the Second

5    Circuit to the sentence that I intend to impose here today.

6          Okay.

7          Do you want to be heard with regard to the

8    appropriate sentence?

9          MR. NIR:  Judge, before I'm heard, I'm going to ask

10   that my client be given a moment to speak and make a statement

11   to the court.

12         THE COURT:  Sure.

13         Go right ahead.

14         THE DEFENDANT:  Good afternoon, your Honor.

15         THE COURT:  Good afternoon.

16         Good morning, really.

17         THE DEFENDANT:  Good morning.  I'm sorry.

18         I have been a target of a mosque, called the Mosab

19   Nabri, located half block from Cleopatra Restaurant.  That's

20   my brother's business.  Since my brother made a donation  --

21   and the check went to the Children and NYPD victims of 9/11

22   -- I posted the PABA letter on front door and the mosque

23   through Mr. Wahed  --.

24         THE COURT:  The mosque what?  That's the name of the

25   mosque?

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

12

1          THE DEFENDANT:   No.   The mosque through Mr. Wahed

2   became aware of the donation.   Mr. Wahed was hired sometimes

3   to do some cleaning and dish washing in the restaurant.   I was

4   approached by two individuals from the mosque, Mr. Mohammed

5   and Mr. Wahed, to make a cash donation to the mosque.

6          Also they asked me to stop serving liquor, since we

7   are Muslims.   I refused to give the cash donation.   I was

8   afraid of what purpose the money would be used for.   Also my

9   brother's business could not survive without serving liquor.

10          Since that moment I have not had a moment of peace.

11   Constant complaints were made to the police about the

12   restaurant.   All of them was false complaints, some of them

13   about bombs or shootings or partial building collapsing.   All

14   the complaints were made in a very busy time which is the

15   weekend nights to embarrass us in front of our customers.

16          The restaurant was vandalized.   The glass of the

17   front door was shattered four times.   My minivan was smashed

18   six times, three times before the incarceration and three

19   times after.

20          Mr. Wahed is very active at that mosque and I told

21   him at the time we were friendly that I'm on probation and any

22   violation will land me in jail.   Mr. Wahed knew me as a

23   professional, one-man-band player and we're known to the

24   Arabic community.

25          THE COURT:   And well what?

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

13

1          THE DEFENDANT:   And well known to the Arabic

2     community and the Cleopatra business relied heavily on my

3     entertainment and my management and my brother cannot manage

4     the restaurant by himself.   On March 27 of 2004 Mr. Wahed was

5     hired for one day to cover the absence of the original

6     dishwasher and in the middle of that night he harassed a

7     customer for tips.

8          Also, one of the waitresses asked him to lift two

9     boxes of soda.   He bent down and looked under her skirt.   I

10    called Mr. Wahed and I told him what he did was wrong.   I paid

11    him and I asked him to leave.   He came back three hours later,

12    around 5:00 o'clock in the morning, and he instigated an

13    altercation with me and three weeks from that date he made a

14    police report and accused me of assault.

15          I went to trial on a charge of attempted assault in

16    the third degree and I was convicted.   I was convicted on

17    January 7, 2005.

18          Before that, on August 18 of 2004, Mr. Wahed asked

19    my codefendant, Mr. Fawaz Habbas for a ride home.   On the way

20    home Mr. Habbas recorded a voice tape of Mr. Wahed.   It is

21    part of the discovery, your Honor.   Mr. Wahed offered

22    Mr. Habbas that if I paid $15,000 to the mosque he will drop

23    the charge against me.

24          Also, on the same tape, when Mr. Wahed  -- and he

25    said it's either the money or the jail.   He's between this and

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

14

1   this and he said that we will go from the mosque directly to

2   the court to drop the charge.

3           When Mr. Wahed -- when Mr. Habbas asked Mr. Wahed

4   whether this money might fall in the hands of terrorists

5   overseas Mr. Wahed on the tape says there is no terrorists

6   overseas.  Even Hamas is not a terrorist organization.

7           On same tape Mr. Wahed says that the terrorists are

8   the Jews and they are the ones that runs America.  He says

9   that while our nation is at war on terror, your Honor.

10          More than that, Mr. Wahed wants me to lose the

11  custody of my son Kareem.  That I thought was too much for me,

12  your Honor.  I was awarded custody of my son and I raised him

13  alone since he was 18 months old.  I was both a father and a

14  mother to him.  He's ten years old now and at PS 1 in

15  Brooklyn.  I could not bear the fact that Kareem would go to

16  his mother since she never played an active role in his

17  upbringing.

18          Kareem is the third child by her third husband.  She

19  gave up each of her other children to their fathers before

20  they were two years old.

21          That was what provoked me to do this big mistake.  I

22  thought at that time he will be deported since him and the

23  sheik conspired to extort $15,000 and God knows what this

24  money will go for.

25          I have been always pro-government, your Honor.  My

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   brother bought the business on March of 2003.  It was the

2   beginning of the Iraqi war.  I contacted the FBI to report a

3   credit card fraud by middle eastern descent in the Bay Ridge

4   area and every time I give the federal agents the credit

5   cards, Agents Roth and Lender, called me to their office, in

6   Kew Gardens, two out of 15 occasions, they awarded me

7   financially.  I was not doing it for the sake of the money,

8   your Honor.  I don't know that they offer money for this kind

9   of information.  I did it to pay loyalty to my country.

10          Also, two months after my apprehension  -- also two

11  months after my apprehension I have a meeting with Mr. Jack

12  Smith at his office and with his assistants.  I confessed to

13  the details of my crime.  I gave Jack Smith a piece of paper

14  with my own handwriting indicating six different criminal

15  activity that goes on in the Bay Ridge area by middle eastern

16  descent.  One of these criminal activity was a big ring that

17  selling narcotics called hashish.

18          I give Mr. Jack Smith three names of individuals,

19  Tunisian guy by name of Sabri and two Moroccan guys named

20  Nabir and Soni.  Two months later from that date I read in the

21  Daily News on August 24 of 2005 that a ten million dollar drug

22  ring was busted in the Bay Ridge area.

23          And a week later one of the codefendants was

24  assigned to my floor.  I see the exact names on the

25  indictment, 05-323 and now I stand before you, your Honor,

16

1    after I examined myself for the past nine months at the

2    Metropolitan Detention Center.  I have now learned to think

3    before acting on my emotions and not reacting.

4            Back in the year 2000 I took the oath and I became a

5    United States citizen.  I have always been very proud to be an

6    American and raise my son in this great country.  I have

7    caused my loved ones extreme hardships.  I may lose my son who

8    means more to me than my own life.  I have hurt the people

9    that love me and need me, like my son, my wife, Barbara, my

10   father, he's 82 years old and my mother she's 77 years old, my

11   brother my sister, my nieces.

12           This has tormented me day and night since my

13   incarceration.  Pleading guilty was my first step in

14   recognizing the wrong that I have done, your Honor.  And now I

15   stand humble before you here in federal court, with remorse

16   and regret for my actions.

17           I want you to know, your Honor, that I'm truly

18   sorry.  I'm truly sorry for everything that I have done,

19   honestly.  And I will never do anything to jeopardize the

20   freedom that I have in this great country.  May God bless you,

21   Judge Gleeson, and bless the United States of America.

22           Thank you.

23           THE COURT:   The fault is probably mine.  But I

24   couldn't understand, given what you said about the mosque and

25   Wahed and the contribution to the 9/11 fund and then you're

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1  hiring Wahed.  I couldn't understand why in early 2004, given

2  that history, you hired him in the restaurant, even for a

3  night.

4         THE DEFENDANT:  He was hired sometimes a total of

5  maybe 20 days.  He's not a steady employee.  When we need some

6  cleaning or dish washing and we don't have the dishwasher, we

7  hired him because he hang out in front of the mosque.

8         THE COURT:  Was this after they begun to pressure

9  you?

10        THE DEFENDANT:  No.  Exactly in the beginning of

11 2004, at the time that I made the donation to the NYPD.

12        THE COURT:  When was that donation?

13        THE DEFENDANT:  It was in January of 2004 and

14 Mr. Jack Smith have a copy of that.

15        THE COURT:  When did the Cleopatra open, in 2003?

16        THE DEFENDANT:  In 2003, the beginning of the Iraqi

17 war, 2003, March.

18        THE COURT:  Thank you.

19        Mr. Nir.

20        MR. NIR:  Your Honor, my client's family, some of

21 whom he's described, his wife Barbara, his brother, his

22 parents and other relatives, nieces, and the like are seated

23 in the audience in the second row.

24        As my client has indicated, he is very remorseful

25 and sorry for everything that's taken place here and it's

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1  apparent, your Honor, that no matter, you know, what we say

2  and that this court will sentence my client to what this court

3  believes is appropriate.  We would argue, your Honor, that an

4  appropriate sentence in this matter would be more along the

5  lines of what was agreed to in the plea agreement and

6  somewhere in the period of 27 to 33 months.

7           And to give him more than that, to exceed that, your

8  Honor, I think that it  -- not only will it hurt my client and

9  certainly punishment is to hurt the defendant.  But it will

10  also hurt my client's family and there's at least one person

11  who is not here today and that is my client's son, who is now

12  ten years old.  He was nine years old when this all started to

13  take place and that is as my client has indicated the person

14  who was first and foremost in his mind at that time.

15           THE COURT:  Okay.

16           One thing should be clear  -- you're right  -- I'm

17  going to impose a sentence I think is just.  It's not

18  notwithstanding what gets said here.  It's, in part, in light

19  of what gets said here.

20           Secondly, you mentioned what's stated in the plea

21  agreement.  It's not my understanding that there's an agreed

22  to sentence.

23           MR. NIR:  There was not.

24           THE COURT:  Was there any discussion prior to the

25  entry after pleas that the government's intention, which since

19

1   has been acted upon, was to seek an upward departure?

2          MR. NIR:  There was nothing discussed at that time

3   about the government seeking an upward departure.

4          THE COURT:  Anything said to you then which is

5   inconsistent with the government's current application for an

6   upward departure?

7          MR. NIR:  Since nothing was ever discussed regarding

8   an upward departure, I can't say that there was anything

9   discussed at all with regard to that aspect.

10          THE COURT:  Well, no.  It's not true.  I mean it

11   strikes me that conversations along the lines of we're not

12   going to take a position where within the range, for example,

13   might obviously be inconsistent with the government now

14   saying, judge, please upwardly depart.

15          The reason I mention this is you brought it up.  You

16   characterized this agreement as an agreement to a sentence

17   within that estimated range and I want to know exactly what

18   you mean by that.

19          MR. NIR:  Well, judge, the agreement imposes a

20   maximum level by which my client will not file an appeal and

21   he agreed not to file an appeal should he be sentenced to I

22   believe 60 months or less.  It was my understanding and I will

23   say that the government never said anything other than they

24   won't take any position with regard to a sentence, in regard

25   to this matter.  Nothing was ever discussed with regard to any

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   enhancement of anything that was requested in the agreement.

2           THE COURT:  Okay.

3           Mr. Smith.

4           MR. SMITH:  Judge, on that point, just to I think

5   reiterate what Mr. Nir said, we did have discussions.

6   Specifically, one of the issues in the plea agreement was what

7   Mr. Rahman would plead to and he pled to rather than a charge

8   with a five-year cap, he pled to a charge with a longer cap.

9   And another issue was this waiver of the plea agreement.   --

10          THE COURT:   Waiver of appeal.

11          MR. SMITH:  I'm sorry.  Waiver of appeal, your

12  Honor.  Though we did not discuss specifically what motions

13  the government's would be making.  It was implicit in these

14  negotiations that the government reserved the right to make

15  argument that he be sentenced higher than the guideline range

16  in the case and I think that's consistent with what Mr. Nir

17  said.

18          Your Honor, in addition to that, as to one of the

19  things Mr. Rahman said, Mr. Rahman did meet with the

20  government prior to entering his plea.  He did admit his guilt

21  in this offense and he did provide information regarding

22  criminal conduct that he for the most part knew of third-hand,

23  but some things he knew of firsthand.

24          I want to make clear for the record that none of his

25  information has been used in any case.  The case that

1  Mr. Rahman speaks of now I frankly don't even know of it and
2  I'm certain, because this is my case, that no information
3  given by Mr. Rahman was used in any sort of investigation by
4  the government.

5           Your Honor, that said  --.

6           THE COURT:   What about this illusion to having been
7  a paid informant?

8           MR. SMITH:  Yes, your Honor.

9           I have spoken to the agent who  -- and I addressed
10 this in the government's December 8 letter.  I spoke to the
11 FBI agent who worked with Mr. Rahman.  Mr. Rahman was an
12 informant working for money.  He was not paid a large sum of
13 money and no arrests were ever made using his information.  He
14 claimed to have information about credit card fraud.  The FBI
15 agent involved, who Mr. Rahman stated his name, was on a
16 credit card squad with the FBI.  I think there were, if I
17 remember correctly, there were discussions about wiring up the
18 Cleopatra for the purpose of these investigations.   In
19 essence, it never went anywhere.

20          The agent did have a good relationship with
21 Mr. Rahman and didn't leave on bad terms with him.  But the
22 impression I got from speaking to him was this was not
23 something that he was doing out of the goodness of his heart.
24 This was a situation, in most situations with the FBI, where
25 people are paid for providing information.  I don't think

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    Mr. Rahman was provided very much money at all because I don't

2    think very much was done.

3              THE COURT:  Okay.

4              MR. SMITH:  Your Honor, in a situation like this, in

5    such an unusual crime, and under 3553 A, the history and

6    characteristics of the defendant are paramount.  Before the

7    court you have a man who has twice been convicted of assault

8    and in one of those cases he brutally assaulted and

9    hospitalized a man in Manhattan, broke his teeth, broke his

10   jaw.  To this day he's failed to accept responsibility for

11   that crime.

12             He's also the person he set up here.  I think it

13   bears mentioning here.  The innocent person who he conspired

14   to accuse of a crime that could have given that person a life

15   sentence, that's a person that Mr. Rahman stands convicted of

16   assaulting as well.  So he framed a person he assaulted

17   because that person went to the police.  I think Mr. Rahman

18   inability to accept responsibility and his attempts to justify

19   his behavior in this case really provide a window into what a

20   dangerous and disturbed person he is.

21             This defendant is unlike the other defendants that

22   this court has sentenced in this case.  He has a record of

23   violence.  He had the central and motivating role in this

24   offense and more than any other he has tried to justify what

25   he did by demonizing the victim, by going so far as to suggest

1  that the victim is somehow in league with terrorists to

2  justify his behavior in this case.

3         THE COURT:  What is your response to the  -- what I

4  understood to be  -- the claim by Mr. Rahman that there's a

5  tape-recording that bolsters his claim that there was an

6  extortion, a shakedown attempt, by Wahed of him?

7         MR. SMITH:  There was a tape, your Honor.  And, in

8  fact, when we first met Mr. Rahman in the course of this

9  investigation when he sat down and talked with the government

10 before this plot became unearth, he immediately provided us

11 with a copy of that tape.  And on that tape there are

12 discussions between Mr. Rahman and Mr. Habbas about money

13 being paid to drop the charges.

14        MR. NIR:   I just want to interrupt.  Between

15 Mr. Abdul Wahed and Mr. Habbas.

16        MR. SMITH:  I apologize.

17        Mr. Abdul Wahed and Mr. Habbas about money being

18 provided to drop the charges in this case.  In fact, one of

19 the things on the tape that's clear is Mr. Abdul Wahed says I

20 don't want the money for me.  I don't need anything.

21 Something like I only need the clothes on my back, something

22 along those lines.  The money should be provided to the

23 mosque.

24        However, in the course of the government's

25 investigation, we spoke with Mr. Habbas who cooperated with

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1  the government about this tape and what he stated to the

2  government is that the tape that the government was eventually

3  provided had been edited and that certain portions of that

4  tape where Mr. Abdul Wahed said things that didn't help

5  Mr. Rahman and where statements were made that made it clear

6  that Habbas was the one who was soliciting the payment attempt

7  had been edited out of the tape.

8            In fact, as we prepared for trial in this case, I

9  believe the court signed a subpoena for  -- signed a subpoena

10 for the defendant to provide us with the original tape that

11 was used in this case.  So while the victim certainly was

12 willing to drop the charges if a certain amount of money was

13 paid to the mosque.  There's no question about that.

14 Mr. Rahman characterization of that as a bribe that he meant

15 was incorrect.  What it was was his response to an offer by

16 Mr. Habbas to Mr. Rahman to do that thing, to drop the

17 charges.

18            THE COURT:  So Habbas told you that on behalf of

19 Mr. Rahman he offered to pay Wahed to walk away from the

20 assault case?

21            MR. SMITH:  Exactly.  He offered to have him paid,

22 not necessarily the money was going to come from him, that he

23 would get the sum of money.

24            THE COURT:  Sorry.  I interrupted you.

25            MR. SMITH:  Your Honor, I don't have much more to

25

1    say.  I think this crime speaks for itself.  This victim was

2    unjustly imprisoned for two months.  He is, in essence,

3    kidnapped and held against his will.  Mr. Rahman used the

4    federal government, in essence, to kidnap this person and but

5    for  -- and I think this is the final point  -- but for this

6    crime being unearth Mr. Abdul Wahed could have spent the rest

7    of his life in prison, likely would have spent the vast

8    majority of the rest of his life in imprison.

9             THE COURT:   What do you mean by that?  Based on the

10   frame-up?

11            MR. SMITH:  Yes.  He faced a life sentence, your

12   Honor.  Statutorily, because the crime that he was accused of,

13   the statutory maximum  --.

14            THE COURT:  That's the statutory max.  Are you

15   referring to the  -- I thought you might be referring to the

16   fact that plan one, which never was executed, was to frame him

17   for rape.

18            MR. SMITH:  Well, that's true, judge.  No.  When I

19   spoke just now, I was referring to the federal crime that he

20   framed him for, which would be retaliating against a witness

21   in a federal criminal case.

22            THE COURT:  That doesn't really get people a life

23   sentence, statutory maximums notwithstanding.

24            MR. SMITH:  Given Booker and 3553 A, though

25   practically I agree with the court, certainly it's a situation

1   where Mr. Abdul Wahed could have been in prison for many

2   years.

3            THE COURT:  It's nothing no sneeze at.  I don't mean

4   to suggest that.  Who's idea, from the government's

5   perspective, was the original idea to have Nadia Zeid falsely

6   accuse Wahed of rape?

7            MR. SMITH:  Your Honor Mr. Atif Mahmoud also

8   cooperated with the government.  He was another coconspirator

9   here, informed us that he was approached by the defendant and

10  by Habbas to do that.  He said, no, that I'm not going to have

11  her do that.  That plan was then dropped.

12           THE COURT:  Atif Mahmoud attributed it to Habbas and

13  this defendant?

14           MR. SMITH:  Right.

15           THE COURT:  Anything further?

16           MR. SMITH:  No, your Honor.

17           THE COURT:   Anything further from the defendant?

18           MR. NIR:  I'll take umbrage only with one thing

19  Mr. Smith has indicated, that is, your Honor, that the

20  original tape was provided to the government and in my

21  estimation, your Honor, there was no difference between the

22  original tape and the earlier tape which had been provided to

23  the government when Mr. Rahman and other counsel met in the

24  government's offices.

25           And the fact of the matter is that the statement did

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    not come from Mr. Habbas as to the money.  The first approach

2    on the money in my estimation came from Gemal Wahed with

3    respect to this matter.

4           THE COURT:  Habbas and the defendant can't both be

5    right on this edited tape thing.  Did you get the original?

6           MR. SMITH:  We got a tape from Mr. Nir and we

7    submitted it to be tested.  I think when Mr. Nir gave it to us

8    he couldn't say for certain that there was the original, only

9    that this was the tape the family had given him.

10          MR. NIR:  I was informed, your Honor, that it was in

11   the location where my client had indicated it would be found,

12   that that was the original tape, that there were no others

13   besides that.

14          THE COURT:   Okay.

15          Anything further?

16          MR. NIR:  No, your Honor.

17          THE COURT:  Anything further from you?

18          THE DEFENDANT:  No, your Honor.

19          THE COURT:  All right.

20          Well, there's parts of this case that are

21   complicated and nuanced and still subject to some dispute.

22   But to the extent there are some outstanding disputes, like

23   whether this tape that was eventually turned over was the

24   original or just the original of an edited tape, is something

25   else and doesn't matter to my mind.

1          The heart of the case is not complicated and not

2    nuanced and not subject to dispute.  And, that is, to right

3    what you perceived to be wrongs committed against  -- rightly

4    or wrongly  -- you started this ball rolling towards federal

5    agents arresting this Abdul Wahed.  And, if all went according

6    to your plan, you would still be out there in the street

7    conducting your business and Abdul Wahed would be at the front

8    end of the a very long prison term.

9          I've said this in connection with your codefendant

10   sentencings.  I'll say it again.  This is not a typical

11   obstruction of justice.  This case is outside what we call the

12   heartland.  Typically, obstructions of justice entail people

13   engaging in tactics, sometimes lying, sometimes hiding

14   documents, to fend off government scrutiny of themselves or

15   their friends.  It's rare  -- and in my experience unique  --

16   that an obstruction of justice is more than affirmative,

17   aggressive, predatory type of offense, like it is here, the

18   object of which is to get some innocent person  -- and frankly

19   I don't really care from a sentencing perspective  -- I don't

20   care if in your view he was not innocent, in the sense that

21   you describe in your narrative, he was innocent of the crime

22   that he got locked up for and thrown in jail for and would

23   have spent years in jail for and that's the crime that you

24   framed him for.  It's an outrageous, an absolutely outrageous

25   manipulation, distortion of the processes of this justice

1   system.

2           The case falls outside the heartland.  I'm not

3   persuaded by your plea for leniency here today, given the

4   history that the government has alluded to, given the

5   egregious nature of this crime.

6           You're sentence is eight years in the custody of the

7   Attorney General.  I've considered all the factors under 3553

8   A.  I have not specifically set forth on the record all of the

9   results of that consideration.  I've set forth on the record

10  what I consider to be the part of the case, which is the case

11  falls outside the heartland.

12          It's an eight-year sentence to be followed by a

13  three year term of supervised release.  A special condition of

14  supervised release is that you received mental health

15  treatment as directed by the Probation Department.  There's a

16  one hundred dollar special assessment, but no fine.

17          You have a right to appeal the sentence I have just

18  imposed, Mr. Rahman.  If you wish to do that, you have to file

19  a notice of appeal, in this courthouse, within ten days or you

20  lose your right to appeal.  If you can't afford a lawyer to

21  represent you, one will be appointed for you to prosecute the

22  appeal.

23          Do you understand what I have said about the appeal?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Is there a place of incarceration you

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

30

1   want me to designate?  Do you want me to have it as a

2   recommendation to the Bureau of Prisons that he be

3   incarcerated as close as possible to New York?

4          MR. NIR:  Yes, your Honor.

5          THE COURT:  I'll do that.

6          Anything else that I have not addressed that I

7   should have addressed?  Are there open counts?

8          MR. SMITH:  Yes, your Honor.  And the government

9   would move to dismiss.

10          THE PROBATION OFFICER:  Your Honor, is that sentence

11   to run consecutive to the previous sentence?

12          MR. NIR:  Judge, he apparently received a thirty-day

13   sentence in the criminal court  -- a ninety-day sentence in

14   the criminal court.  I would ask that that sentence run

15   concurrently.

16          THE COURT:   On the what?

17          MR. NIR:  On the attempted assault charge.

18          THE COURT:  Of Wahed?

19          MR. NIR:  Of Wahed.

20          THE COURT:  No.  It was not my intention to run it

21   concurrently.  That's why I didn't mention it.

22          Anything further?

23          MR. SMITH:  No, your Honor.

24          THE COURT:  Have a good day.

25                    Oo0oo0

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER